**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMIT SHARMA | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. |
| v. | ) | |
| | ) | [Related to Delaware Superior Court |
| STEVEN WESLEY, et al. | ) | Case No. N18C-01-091 ALR] |
| | ) | |
| Defendants. | ) | |

## **NOTICE OF REMOVAL**

TO:   **THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

Defendants Steven Wesley, Geoffrey Klopp, Perry Phelps, Jennifer Biddle, Marc Richman, Janet Durkee, Michael Merson, Julie Petroff, Robert Coupe, Carole Evans, Christopher Klein, and Delaware Department of Correction  (collectively, State Defendants)[1], by and through the undersigned, hereby remove the above-captioned case to this Honorable Court and provide notice of same to Amit Sharma ("Plaintiff").  In support thereof, Defendants aver as follows:

1.      Plaintiff's First Amended Complaint in the above-referenced was filed in the Superior Court for the State of Delaware on or about August 7, 2018.   (A copy of the First Amended Complaint is attached hereto as **Exhibit A**).

2.      The Delaware Department of Correction was first served on August 13, 2018.[2] Consequently, this application is timely.

---

[1] Plaintiff listed the Correctional Officers Association of Delaware ("COAD") in the caption of the First Amended Complaint, but the docket does not reflect that service has been initiated on COAD.
[2] Service has not yet been made on the Delaware Attorney General as required by 10 *Del. C.* § 3103(c).  However, undersigned counsel has entered her appearance in the Superior Court matter and does not contest service.

3.     As stated in the First Amended Complaint, Plaintiff seeks monetary damages for the violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., and 42 U.S.C. § 1981 and § 1983 (Counts I, II, and III) and Interference with Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. (Count V). Specifically, Plaintiff contends that Defendants unlawfully discriminated and retaliated against him based on his national origin. Plaintiff also sets forth state law claims based on defamation (Count IV), intentional infliction of emotional distress (Count V)[3], and Breach of Contract (Count VI).  For these alleged violations, Plaintiff seeks relief in the form of reinstatement, compensatory and punitive damages.

4.     Pursuant to 28 U.S.C. § 1331, this Honorable Court has original jurisdiction over this matter as these claims arise under the laws of the United States. Under 28 U.S.C. § 1441(a), this action may therefore be removed to this Honorable Court.

5.     Concurrent with this filing, and in accordance with 28 U.S.C. § 1446(d), Defendants are also filing a Notice of Filing of Notice of Removal (attached hereto as **Exhibit B**) with the Clerk of the Superior Court for the State of Delaware, thereby giving both the state court in which this matter is currently pending and Plaintiff notice of the Notice of Removal.

---

[3] Plaintiff identified both the Intentional Infliction of Emotional Distress and Interference with FMLA Counts as "Count V."

**WHEREFORE**, State Defendants pray that the above-referenced action in the Superior Court for the State of Delaware be removed to this Honorable Court.

**STATE OF DELAWARE
DEPARTMENT OF JUSTICE**

*/s/ Adria B. Martinelli*
Adria B. Martinelli (#4056)
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

*Attorney for State Defendants*

Dated: August 16, 2018

# EXHIBIT A

**EFiled: Aug 08 2018 08:47AM EDT**
**Transaction ID 62322796**
**Case No. N18C-01-091 ALR**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR THE COUNTY OF NEW CASTLE

| | | |
|---|---|---|
| Amit Sharma, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| Vs. | ) | C.A. No. N18C-01-091-ALR |
| | ) | |
| Steven Wesley; Geoffrey Klopp; | ) | |
| Perry Phelps; Jennifer Biddle; Marc | ) | |
| Richman; Janet Durkee; Michael | ) | |
| Merson; Julie Petroff; Robert | ) | |
| Coupe; Carole Evans; Christopher | ) | |
| Klein; Delaware Department | ) | |
| Of Correction and Correctional | ) | |
| Officers Association of Delaware, | ) | Jury Trial Demand |
|     Defendant(s). | ) | |

## FIRST AMENDED COMPLAINT

### I. JURISDICTION

1. Jurisdiction for pursuit of this civil complaint in the Superior Court is established at 10 DEL. C., subsection 541 and venue is proper.

### II. PARTIES

2. Plaintiff, Amit Sharma, resides in the State of Delaware, County of New Castle, at 22 Lisa Drive, Newark, DE 19702.

3. Defendant, Steven Wesley, is employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

4. Defendant, Perry Phelps, is employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

5. Defendant, Jennifer Biddle, is employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

6. Defendant, Marc Richman, is employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

7. Defendant, Janet Durkee, at all times relevant to this complaint was employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

8. Defendant, Michael Merson, is employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

9. Defendant, Julie Petroff, at all times relevant to this complaint, was employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

10. Defendant, Robert Coupe, at all times relevant to this complaint, was employed with the Delaware Department of Correction Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

11. Defendant, Geoffrey Klopp, is employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904 and President of the Correctional Officers Association of Delaware ("Union").

12. Defendant, Carole Evans, is employed with the Delaware Department of Correction, Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

13. Defendant, Christopher Klein, at all times relevant to this complaint, was employed with the Delaware Department of Correction Central Administrative Office located at 245 McKee Road, Dover, DE 19904.

### III. STATEMENT OF FACTS

14. Defendant hired Plaintiff on October 19, 2006, and post-academy remained at Howard R. Young ("HRY"). For six years, managed the high-profile and critical Disciplinary Housing. As a Sergeant, assigned to the busiest floor and led the Primary Quick Response Team. To be well versed of institution operations, learned

2

classification on personal time. On the floor, spent most of the shift conducting security checks in areas; three to four times more than any other Corporal and Sergeant (Lead Worker). An indisputable fact; Officer and Area log entries can support. More important, dealt with superiors, equals, subordinates, and offenders with interpersonal skills. The employee file was immaculate with training documentation, commendation, and perfect attendance certificates. No accounts of disciplinary, counseling or warning. An incident-free career retaliatorily ended over a protected activity.

<h3 align="center">FIRST COMPLAINT</h3>

15. After seven years and eight months on the job, officially reported a coworker for a hostile work environment. (Exhibit 1) The complaint specified verbal abuse by Sergeant Gregory Perella ("Perella"). The two Officers that witnessed the incident also completed corroborative reports. (Id.) Officers reported Perella shook their hands to assure they were not his target.   The second complaint filed on July 3, 2014, for Perella's attempt to intimidate in the parking lot. (Id.)

<h3 align="center">GROUP POLARIZATION</h3>

16. On July 7, 2014, Perella's fellow Marines Sergeant Christopher Welch ("Welch") and Sergeant Demetrius Clark ("Clark") formed a coalition of Corporals and Sergeants ("Lead Workers").   Welch and Clark demanded a meeting with Shift Commander Captain Joseph Sabato ("Sabato"). The meeting initiated with a question asked by Sabato, "So, why do we all hate Sharma?"   Lead Workers expressed outrage and protested complaints filed against Perella. Those who never had an issue with Plaintiff expressed extreme views. Welch vowed to burn the shift down if Plaintiff promoted to Lieutenant. Clark demanded, stop Sharma or we will. Per Sabato, he alerted Warden Steven Wesley ("Wesley"). Defendant did not investigate.

17. On July 30, 2014, Defendant scheduled an initial interview for conflict resolution. Diversity Coordinator Roy Lawler ("Lawler") and Major D. Bamford ("Bamford") conducted the interview. Plaintiff discussed the hostile work environment incidents and group polarization. Moreover, continuous harassment and opposition in

the workplace had affected health and relationships. Plaintiff accepted the offer for conflict resolution. Lawler said after speaking with Perella later, he will prepare a report for Human Resources ("HR") and Wesley and will be in touch. (Continued at )

## NATIONAL ORIGIN DISCRIMINATION

18. Lieutenant recruitment [031214-MBDB04-380400] opened March 14, 2014, and closed March 23, 2014. Applied on March 16, 2014, received test scores April 8, 2014, and interviewed June 24, 2014. (Exhibit 3)

19. On July 13, 2014, two promotions awarded to non-Indian candidates ranked first and second. (Exhibit 4)

20. On August 9, 2014, for a subsequent opening, Wesley used the referral list to select the ranked fourth non-Indian candidate for promotion. (Id.)

21. On August 14, 2014, due to a family emergency, on approved leave, left the States for India. While in India, learned about the two additional openings and Wesley used the referral list to select two non-Indian candidates ranked third and fifth.

22. On August 22, 2014, requested Interview Panel Chairperson Staff Lieutenant G. Fahey ("Fahey") for interview scores. (Exhibit 5) As he directed, contacted Human Resources K. Nunn ("Nunn") and J. Rush ("Rush"). On August 25, 2014, as required by Rush to have Union Representative contact, had Bryant make the request. On August 28, 2014, Bryant and Plaintiff requested Rush for the August 19, 2013, Sergeant interview score sheet. On September 4, 2014, returned to States and contacted then HR Assistant Director J. Biddle ("Biddle"). She asked the reason for requesting a year-old Sergeant interview score sheet and mentioned hesitancy to supply due to not knowing why it was requested.

23. On September 5, 2014, contacted Biddle again and received the Sergeant score sheet. (Exhibit 6)

24. On September 7, 2014, notified Wesley of computation error in June 24, 2014, interview score. The eight points deducted in three categories lowered candidacy rank from fourth to sixth. (Exhibit 7)

25. On September 8, 2014, in response to the Email, Wesley asked if resubmitted same credentials for Lieutenant interviews as for Sergeants. Requested a meeting but he asked for a phone call. During the phone conversation, blamed Plaintiff for not resubmitting same documents to get the same points. Then he stated promotions were in effect, no open Lieutenant vacancy, and the certification list had expired. (Id.)

26. On September 10, 2014, resumed duty and learned Wesley untruthfully stated no Lieutenant vacancy. A vacancy existed after a Lieutenant promoted to Staff Lieutenant from September 3, 2014 interview. (Exhibit 8)

27. On September 19, 2014, Wesley had the existing vacancy reposted as anticipated. (Exhibit 9) For six vacancies, [two original and four subsequent]; he promoted five non-Indian candidates and denied the sixth vacancy to fourth but incorrectly ranked sixth.

28. On September 27, 2014, reapplied for the "anticipated" Lieutenant vacancy. (Exhibit 10) Then, without holding interviews, he filled the vacancy by accepting a Lateral Transfer, a non-Indian employee. However, Delaware State Job Site had the incorrect closing status, 'December 8, 2014-Interviews'. (Id.)

## FIRST GRIEVANCE

29. On September 12, 2014, Wesley violated the terms and agreement of Collective Bargaining Agreement ("CBA"). He denied the timely filed grievance [concerning unlawful denial of promotion] as untimely. (Exhibit 11) His justification was a partial reference to CBA Article 8.3.2. that an employee having a grievance shall file within 14 days and it had been 19 days since last two promotions. However, 8.3.2 also states, …or within 14 days from the date the employee could reasonably be expected to have knowledge of the grievance. (Exhibit 12) HR had delayed issuing Sergeant scoresheet; seemingly to prevent grievance submission. Biddle forwarded the Sergeant interview scoresheet on Friday, September 5, 2014. After comparing the Sergeant and Lieutenant

scoresheets; noted the inconsistency in scoring and established grounds for a grievance. Therefore; had fourteen days, until September 19, 2014, to file.

COMPLAINT STATUS

30. On September 16, 2014, after being ignored by Bamford, contacted Wesley to request the status of official complaints. On September 17, 2014, Wesley's Cc: his response to Dep. Warden M. Ernig ("Emig") and Bamford. (Exhibit 13)

> *Did he file official complaints? If so, what is the status or resolution? Is this something Roy Lawler needs to address since his office handles complaints? Please address this today so it does not morph into something bigger than it has to be.*

31. On September 18, 2014, *Lawler* contacted and acknowledged that Plaintiff's concerns about workplace safety were overall valid. (Exhibit 14)

> *…While not every detail could be proven, we did find that your concerns were valid overall. Appropriate action has been taken.*

32. On September 22, 2014, Labor Relation Manager Julie Petroff ("Petroff") intervened to invalidate complaints *Lawler* confirmed overall valid.

33. On September 24, 2014, at 11:32 a.m., Petroff expressed understanding of complaints; classified as #1 and 2. (Exhibit 15). For compliant #2, she had enough documents to get her started. At 6:52 p.m., seven hours and 20 minutes later, dismissed the complaints. (Id.)

34. Defendant reduced points in three categories: Commendation, Education, and Training. However, Petroff narrowed the focus on training records. (Id.) Next, shifted the focus off Wesley with a misled reference to Interview Panel ('Panel") as Hiring Committee. Per Selection Policy, Warden has assigned authority of consideration [selection]. Moreover, Panel duties are limited to calculate and distribute points for two categories. Experience and Interview (response to questions, professional appearance, and communication skill). Finally, as required, before June 24, 2014, interview on May 30, 2014, Chairperson

determined training points. In her response to the grievance, Petroff suggested should have filed without possessing Sergeant scoresheet [confirmation and grounds]. Second, on Saturday, September 6, 2014, or Sunday, September 7, 2014; knowing the intake person was off on weekends.

35. It was evident from her Email she knew who, what, when, where, why and how. (Id.) Also, that Plaintiff was off from work. Yet, it was hard for her to look into complaint #1 without more information. First, she did not contact Sabato, to get the required information. Next, Petroff lied about her investigative interview about workplace retaliation complaint. Per Union Representative Sergeant L. Bryant ("Bryant") she contacted about promotion grievance. (Exhbit 16 ) Per Bamford, retaliation subject did not come up. (Exhibit 17)

COMPLAINTS TO COMMISSIONER

36. On October 29, 2014, contacted Commissioner R. Coupe ("Coupe") to report Retaliation and National Origin Discrimination. (Exhibit 18) Further, specified Petroff dismissed the retaliation and hostile work environment complaints without an investigation. He Cc: Bureau Chief Durkee ("Durkee") and acknowledged receipt and said would consider a private meeting after he reviews complaints with her. Neither of the two followed-up.

37. On November 6, 2014, filed a complaint with Durkee and Petroff. (Exhibit 19) The complaint cited National Origin Discrimination and violation of Conflicts of Interest Policy 8.9. Also, requested an investigation of Wesley's recommendation letter addressed to the Interview Panel. His successful endorsement of a candidate for a merit-based position had destroyed the integrity of internal promotion process that ensured equal opportunity. Durkee who was already aware of complaint filed with Coupe; did not acknowledge.

## WESLEY ACCOSTED PLAINTIFF

38. On November 7, 2014, having knowledge of the complaint, in less than 24 hours, Wesley confronted Plaintiff on a pretext of harassment towards staff. (Exhibit 20) He falsely accused harassment towards Petroff and gave a direct order to cease and desist communications with her. You can file complaints against me, said Wesley. Just remember that you will also get held liable for harassment by Petroff and Staff. He told Correctional Officer Association of Delaware ("Union")  Representative Jay Lee ("Lee") he was pissed off at Plaintiff.  (Exhibit 21)

39. After the meeting, intended to generate a DAC incident report about Wesley's hostile behavior, false accusations, and employment threats. You are not doing any reports, Sharma, said Captain K. Akinbayo ("Akinbayo") and notified Wesley. The denial to complete an incident report, violated COD 2.2 and 2.3. (Exhibit 22)

## WESLEY'S RETALIATION

40. On November 10, 2014, first of two scheduled days off, Akinbayo harassed with phone calls. He directed to report to work immediately. Accompanied by Bryant, met with Akinbayo. He served Wesley's memo for Removal from Workplace, Psychological Fitness for Duty Evaluation ("FFDE"), and Disciplinary Action. (Exhibit 23) The memorandum directed to go to the Administration Building to meet with Durkee on November 12, 2014, at 0830 hours.

## MEETING WITH DURKEE

41. On November 12, 2014, reported to the Administration Building to meet Durkee. After an introduction, she asked to take a seat, next to Phelps and across from Wesley. Durkee specified the FFDE referral to Forensic & Law Enforcement Services LLC Dr. C. DeBernardo ("DeBernardo"). Failure to comply will entail disciplinary action or employment termination, she warned. Plaintiff asked why the meeting was not private as required by Psychological Fitness for Duty Evaluation Policy 9.19. (Exhibit 24)

8

Also, we have not discussed the complaints against Wesley, will he remain present? Durkee responded, "no, we are not discussing anything." She asked if there were any questions about directions to DeBernardo office. Plaintiff stated no, and she ended the meeting.

### DISCIPLINARY INVESTIGATION

42. Captain Brian Berggrun ("Bergrrun") conducted the investigative interview on November 13, 2014; transcribed by Wesley's Secretary Ann Downey. (Exhibit 25) He explained Wesley directed him to conduct disciplinary investigation and will also make a determination. The only particular of investigation provided was to gather information on Emails sent to HR Personnel considered unprofessional and harassing. Berggrun did not consider that Plaintiff had followed Wesley's directive to not Email complaints to Petroff.

### FFDE

43. On November 20, 2014, met with DeBernardo for the FFDE and was cleared for duty. In the evening, logged on to work Email and noticed one from Linda Wheeler sent earlier at 0946 hours. (Exhibit 26) "Please see attached letter that is being sent Dr. Caren DeBernardo and you this morning." According to Policy 9.19, Chief Durkee was required to provide Plaintiff that letter. (Exhibit 24)

44. On November 26, 2014, reported to the Administration Building to meet Phelps and Wesley was present. Phelps informed of having had received FFDE report and clearance for duty. Next, he exclaimed since your issues are not psychological, but behavioral there will be discipline to correct it. When asked who was issuing the disciplinary and for what? Wesley said, I am disciplining you for the Officers you harassed over the years. So, you do not say retaliation, said Phelps; it will be a Warden from a different facility in charge of it. You can return to work starting tomorrow. Pleaded with Phelps to review complaints and documents, but he declined. Warden falls under my supervisory and is a friend; you will not think I am impartial, said Phelps. Therefore, will not review your complaints. Asked him of options, since he and others have ignored complaints and retaliated.

He expressed his confidence in Human Resources ("HR") to have conducted a fair and impartial investigation. Asked Phelps what sort of investigation excludes the complainant and if he knew of 18 lies in the FFDE referral letter? He responded you could not stop filing complaints against the Warden and now have distrust in HR findings. First, he offered a voluntary transfer to a different facility. Then he said you are welcome to hire an attorney or seek assistance from an outside agency to review your complaints without worrying about repercussions. Phelps said as a man of color, I have faced plenty of discrimination in the department. Wesley nodded in agreement and then said yes, to Chief remarks as has Warden. As inferred, to tolerate discrimination without voicing concerns.

45. On January 5, 2015, reported the violations to Governor J. Markell's Office. (Exhibit 27)

46. On February 9, 2015, Constituent Relations A. Betts informed she had contacted HR, and they considered the matter closed. However, the required dismissal of Charges Memorandum had not been issued. (Id.)

47. On February 13, 2015, on Delawarestatejobs.com, a Lieutenant vacancy was posted for HRYCI. Before applying; requested Union Representative Corporal C. Addison ("Addison") to inquire with Wesley of disciplinary status. As required; he had not issued the memorandum for dismissal of charges. Per Addison, Wesley stated there was not any paperwork being done due to nearly four months have passed, and a Warden from different institution was handling it. (Exhibit 28) Per Addison, Wesley said if Sharma wants to pursue a promotional opportunity, he can.

48. On February 21, 2015, with confirmation from Governor's Office of no disciplinary and approval from Wesley, applied for the Lieutenant Vacancy. (Exhibit 29)

49. On February 25, 2015, Wesley learned about the possible grievance. (Exhibit 30)

50. On February 26, 2015, Wesley retaliated again with the issued disciplinary that cited suspension from duty and demotion under consideration. (Exhibit 31) The two penalties, automatic disqualifications to pursue promotional opportunity for two years.

51. On March 2, 2015, within CBA specified time, requested the pre-decision hearing. Emig secretary scheduled it for March 11, 2015. (Exhibit 32)

52. On March 11, 2015, Addison and Bryant accompanied to pre-decision hearing with Emig. Few minutes into the hearing, Emig stated due to conflicts of interest over his involvement-he cannot conduct the hearing. Therefore, a pre-decision hearing must be rescheduled.

53. On March 26, 2015, pre-decision hearing was held. Bryant informed the Hearing Officer Major F. Way ("Way") Merit Rules 12.5 required pre-decision hearing not to exceed 15 days from when requested, which was March 2, 2015. (Exhibit 33) Therefore, the charges should be dismissed. In violation of Merit Rule 12.5, Way said the hearing would continue since it did not exceed 15 days from the original hearing date March 11, 2015.

54. On April 1, 2015, Way issued his decision of 6 days' paper suspension. (Exhibit 34) On April 3, 2015, although excluded to avoid Conflicts of Interest by Phelps, Wesley issued a final decision which concurred with Ways decision of 6 days' paper suspension. In addition, he threatened employment. (Id.)

55. On April 29, 2015, Bureau Chief Christopher Klein ("Klein") conducted the step 2 appeal hearing for Way's decision of six-day paper suspension. Klein's decision did not cover the listed cause of appeal. The pre-decision hearing on March 26, 2015, had exceeded 15 days requirement; therefore, required dismissal of charges. However, Klein determined Way had rendered his decision within a specified time of CBA 9.4 30 Calendar days. Again, the raised issue was the violation of Merit Rule 12.5; the pre-decision hearing exceeded 15 days requirement. Not, CBA 9.4 the time it took Way to issue his decision. (Exhibit 35) On May 9, 2015, appealed Klein's decision of written reprimand.

56. On July 21, 2015, accompanied by Bryant, arrived at State Carvel Building for pre-arbitration hearing. Wesley, Klein, and Biddle were present. Informed Director of Employment and Labor Practices Monica Gonzalez- Gillespie ("Gillespie") of Wesley's exclusion by Phelps due to conflicts of Interest. However, Wesley refused to excuse himself; therefore, requested the hearing to be rescheduled to bring legal representation. Gillespie responded, I will take your request to reschedule the pre-arbitration hearing and will let you know in a couple of days. However, Gillespie's decision unable to resolve the grievance. (Exhibit 36 )

57. Per Berggrun he was investigating Emails to HR and harassment towards HRM Petroff. Union Representative Sergeant Lyle Bryant: "What are the charges for the 210 package?" Captain Berggrun: "Unprofessional conduct and harassment towards Julie Petroff." (Exhibit 37) HRM Petroff's Investigation Interview Statement: *He has said a lot of things, none of which include any threats of harm or danger.* (Id. at 2) In October of 2015, Biddle confirmed Petroff did not feel harassed. (Id. at 3)

SECOND GRIEVANCE

58. On March 10, 2015, raised a grievance against Wesley. Listed Violations: Unlawful Retaliation for Protected activity; Demotion and Suspension Threats based on Falsified Reports; Labor Law Violations; National Origin Discrimination; Inequality in Workplace; Harassment; Hostile Work Environment; and [not limited to] Violation of Public Trust. Wesley denied the grievance. (Exhibit 38)

59. On March 15, 2015, refiled and Wesley assigned himself to be the Hearing Officer for the grievance filed against him. Instead of hearing the grievant, he remained argumentative. His decision did not encompass the aforementioned violations discussed in nearly three hours hearing. Instead, he limited the focus on justifying his unlawful denials of promotions. (Exhibit 39)

60. In his March 27, 2015, issued decision, he specified that grievant was not promoted to Correctional Lieutenant because his score (56) was tied for seventh, and only the five highest scores were chosen for

promotion. [Note: Plaintiff was ranked sixth, not seventh.] His selection criteria to select the highest score candidate applied only to disadvantage Plaintiff; to deny several promotional opportunities. He did not apply the same criteria to similarly situated employees [candidates]. (Exhibit 40)

> From June 24, 2014, Lieutenant interviews, Wesley selected the candidate ranked fourth (59.5) over the one ranked third (66); with an overall score difference of 6.5.

> From September 9, 2015, Lieutenant interviews; Wesley selected the candidate ranked second (68.5) over candidate ranked first (79); overall score difference 10.5.

## JUSTIFICATION FOR INCONSISTENT SCORING

61. He wrongly blamed Plaintiff for not resubmitting credentials submitted for August 19, 2013, Sergeant interview. Plaintiff did not resubmit credentials to Lieutenant interview panel for two reasons. First, did not possess additional credentials [maxed in Training] to ones already submitted during Sergeant interview on August 19, 2013. Second, Defendant was required to place the submitted credentials in Personnel Records. (Exhibit 41)

> Personnel Records Policy 9.5 affirmed that Defendant maintained three types of Employee Records: Personnel, Working, and Medical Records. Information collected in Personnel Records is reliable and complete, and no other records are kept on any employee. Also, that Personnel Records are maintained in accordance with Merit Rules and Union Contract.

> Merit Rules 16.1 [Master Personnel Records] required Defendant to establish and maintain Personnel Records of every Human Resource transaction.

> CBA Article 25.2 required Respondent to place commendation in Employee Personnel Record.

> Selection Process for Internal Promotion and Transfer Policy 9.24 required point allocation for education, even if a candidate did not bring documents to interview. Also, an obligation to ensure equal opportunity through the integrity of its internal promotion and transfer process with selection based on a consistent scoring system.

> Per State of Delaware Employee File Guidelines HR Offices are expected to maintain and transfer employee files in the following format. Section 3: Commendation and Section 5: Training Related Material and Education

UNLAWFUL DENIAL OF PROMOTION(S)

62. Correctional Lieutenant Recruitment #021215-MBDBO4-380400 opened February 14, 2015, applied February 21, 2015, and closed February 23, 2015. (Exhibit 42 ) On March 19, 2014, the initial referral list issued for a Lateral Transfer. From the second referral list; interviewed April 29, 2015, with highest interview and overall score. (Exhibit 43 ) Defendant reduced the overall score from 68 to 62 by not awarding six points for education. (Id.) On April 30, 2015, Wesley selected Clark with an overall score of 65. (Id.) On May 3, 2015, requested the interview score. (Exhibit 44) Then, without a policy to make employees aware, twelve days later, May 11, 2015, *Nunn* required converting foreign degree credits to U.S. equivalency.

Promotion Consideration Request for a Subsequent Lieutenant Opening

63. At Sussex Correctional Institution, an anticipated Lieutenant Recruitment 052615-MBDB04-380600 opened May 29, 2015, and closed June 6, 2015. Lieutenant *Steven Rogers* ("Rogers") successfully interviewed and accepted as a lateral transfer. His last day at HRYCI July 10, 2015, and first day at Sussex July 13, 2015.  On July 14, 2015, inquired and requested promotion consideration. (Exhibit 45) *Emig* verified the referral list was active the day inquired. (Id.) After *Clark's* promotion, Plaintiff ranked number one candidate on the active referral list. (Exhibit 46) The grounds for the request was Merit Recruitment Procedures, to consider an interviewed and qualified candidate, rather than reposting to recruit. (Exhibit 47) Also, a common practice at HRYCI. *Wesley* had selected several non-Indian employees from the referral list. (Exhibit 48) Again, *Wesley* denied a qualified employee a promotional opportunity and continued his search by reposting the vacancy on July 22, 2015.

SECOND DISCIPLINARY ACTION FOR REPORTING HARASSMENT AND SAFETY CONCERNS

64. On May 27, 2015, reported Staff Lieutenant Harris Warren's ("Warren") retaliatory harassment and cited concern over his poor impulse control, violent and uncontrollable anger in workplace. (Exhibit

49 )

65. On June 5, 2015, Captain P. Sheets ("Sheets") reprimanded Plaintiff for filing complaints. Sheets stated you were way out of line for filing official complaints. Sheets also stated that he does not think Warren is guilty and that Plaintiff is the one being investigated and will receive discipline.

66. On June 23, 2015, requested information from Sheets, name of person who had ordered disciplinary which he did not provide.

67. On June 29, 2015, contacted Bamford to request assigning someone other than Sheets for investigation but he did not respond. (Exhibit 50)

68. On July 22, 2015, second disciplinary charge letter prepared; for raising concerns over Warren's violative behavior in workplace. (Exhibit 51)

69. On July 25, 2015, served disciplinary package which had a hand-written note from Wesley that read, make sure this Sergeant understands the usage of the incident reporting.

REPORTED WESLEY'S UNLAWFUL CONDUCT AND DISCRIMINATORY PRACTICES

70. On July 21, 2015, after being ignored and retaliated against for internal complaints, contacted Correctional Committee Members, State Senators to report Wesley's unlawful conduct and discriminatory practices at HRYCI. (Exhibit 52) Specified, over a protected activity, his retaliatory decision to place on administrative leave, fitness for duty evaluation and disciplinary action. Also, Durkee's punitive approval for FFDE as a continued condition of employment without justification. Coupe's failure to investigate complaints and more.

GOVERNOR J. MARKELL'S EMAIL TO EXECUTIVE AGENCIES EMPLOYEES

71. On July 23, 2015, Markell emailed executive agencies employees about violations of State harassment and discrimination policies by State employees. He encouraged NAACP/IMAC efforts

and to consult with this group without fear of reprisal. Moreover, he [reiterated] assured protection against acts of reprisal for reporting harassment or discrimination and accountability for management to adhere and promote zero-tolerance policies. (Exhibit 53)

72. On July 28, 2015, attended the NAACP/IMAC meeting in Wilmington. Three ranking officers assigned to HRYCI saw plaintiff.

73. On July 29, 2015, at approximately 0630 hours, Wesley met with Plaintiff in his conference room. Union Representative R. Fountain and Staff Lieutenant S. Farmer were present. Wesley issued a memorandum Re: Removal from the Workplace and Pending Disciplinary Investigation. (Exhibit 54) His justification for removal was Policy 9.22 because Plaintiff' presence in workplace jeopardizes others' safety or security or the public confidence. Further, notification of a disciplinary investigation in accordance with Policy 9.12 to determine if the complaint filed with Senators on July 21, 2015, violated COD or policy. Plaintiff was humiliated with Employee ID snatched and escorted out of prison by Lieutenant W. Faust.

## FAILURE TO ACT

74. Contacted Markell to apprise Wesley Retaliated in less than 10 hours after attending the NAACP/IMAC meeting. (Exhibit 55) On July 30, 2015, received a response from Relations Constituent Director Jen Hill. She stated someone from OMB would contact in the next two business days. On August 3, 2015, Sandy Reyes ("Reyes"), ESQ from OMB and Governors Equal Employment Opportunity Counsel contacted to investigate. Plaintiff explained the complaint to State Legislators referenced Title VII and EEO violations and forwarded documents. On August 27, 2015, she responded: *I don't have any updates. I am sorry to say that. I advise that you stay in close contact with your union.* (Exhibit 56) Markell was insincere with his assurance to protect against acts of reprisal for protected activity. He failed to take preventive measures; to hold management

accountable for violating Public Policies and Executive Order 8.

75. On August 10, 2015, met with Investigator Captain M. Merson ("Merson"). He accused Plaintiff of falsely informing Senators that Caucasians are not promoted at HRYCI. Clarification that the intended meaning in stating Non-African American or Caucasians fell on deaf ears. He also disregarded the fact on April 5, 2015, had filed the same unacknowledged complaint with Biddle. (Exhibit 57)

SUBSTANTIAL AND PROCEDURAL VIOLATIONS OF EMPLOYEE DISCIPLINARY ACTION POLICY

76. Merson violated Employee Disciplinary Action Policy 40.03 to achieve his biased findings. In the disciplinary report misstated the prior disciplinary actions; relied on by Wesley as a just cause for employment termination. Wesley was aware on May 5, 2015, Klein had reduced April 1, 2015, six days' paper suspension to Written Reprimand. (Exhibit 58) The Written Warning charge letter was prepared on July 22, 2015, and served to Plaintiff on July 25, 2015. On July 28, 2015, filed the grievance to appeal. (Exhibit 59) On July 29, 2015, Administrative Specialist II Theresa emailed: *This office is requesting that the scheduling of the above Step 1 be held in abeyance until the outcome of the 210 investigation.* Defendant did not afford the due process of holding a pre-decision and fact-finding hearing. Also, Step 2 appeal decision is final unless grievance moves to Pre-Arbitration and Arbitration. Therefore, should not have listed as prior disciplinary.

6. Blocks #9 and #10 are used to prove that the investigation was objective and impartial. Be sure to include all facts relevant to that version. *In block #10 list only facts, not assumptions.*

Merson: *"It is my observation that Sgt. Sharma only corrected his statement when confronted with the fact that he accused Administrators…"*

8. In block #11 include only those disciplinary actions that are documented in the employee's file in the Department of Correction Human Resources Office. Anything else is not official and is to be treated as though it never existed.

*11. List prior disciplinary actions and the date presented:*
*Written Warning on July 21, 2015*
*6 day paper suspension on 4/1/15*

### RETALIATORY TERMINATION REQUEST

77. Wesley's employment termination memorandum dated August 19, 2015, was received by Klein's office on August 12, 2015. Without the two incorrectly listed Disciplinaries, Wesley's Just Cause discerned for what it was, "retaliatory." (Exhibit 60)

### STATUS MEETING

78. On September 2, 2015, Bryant accompanied to James T Vaughn Correctional Center ("JVTCC") for a status meeting with Klein and Biddle. Klein specified either accept the transfer to or face employment termination. He explained based his decision on Wesley's complaint of a hostile work environment due to complaints filed against him and since he cannot relocate him, he is making the offer to Plaintiff.

### DISMISSAL OF DISCIPLINARY INVESTIGATION

Klein confirmed no disciplinary action for communication with Senators; rescinding Wesley's memo, notice of disciplinary investigation. "At the meeting, we discussed that no further action will result from that investigation…" (Exhibit 61) Klein's did not base his decision on professional integrity; but rather to coverup Wesley's retaliation. First, Plaintiff had inadvertently received Wesley's August 19, 2014, memo for employment termination. Therefore, Defendant did not proceed with employment termination. Second, failure to validate conveyed false information to Senators

### INVOLUNTARY TRANSFER

79. On September 11, 2015, Biddle forwarded Klein's involuntary transfer letter to Plummer Community Correctional Center ("PCCC") with the same schedule of 12x8 shift with Thursdays/Fridays off. (Id.) His decision violated CBA 24.9, which prohibited involuntary transfer.

(Exhibit 62) On January 5, 2016,  Union President G. Klopp confirmed Klein deceitfully stated Union had agreed with his involuntary transfer decision.  (Exhibit 63)

80. On September 22, 2015, filed a grievance regarding Klein's arbitrary and retaliatory decision of involuntary transfer; a direct result of Wesley's demand which entailed from his knowledge of filed complaints concerning Title VII violations. (Exhibit 64)

81. On October 12, 2015, Medical Bureau Chief M. Richman ("Richman") with Biddle present, conducted the grievance hearing. (Exhibit 65) Richman stated he would record the hearing and suggested do the same. Richman did not have copies of CBA OR Merit Rules. Moreover, lacked familiarity with the issue(s) listed in the grievance he was assigned to make an impartial decision. It is irrefutable that Richman did not investigate, communicate with individuals mentioned in the grievance, or gather paperwork to support or against the listed violations in the grievance. Besides not answering the grievance, he excluded Biddle's [recorded] confirmation but for Wesley's retaliatory demand caused Klein's decision of involuntary transfer.

## DENIAL OF OPPORTUNITY TO INTERVIEW

82. Correctional Lieutenant Recruitment #121815-MBDB04-380400 opened December 19, 2015, applied December 26, 2015, and closed December 28, 2015. (Exhibit 66 ) On January 15, 2015, received the eligibility confirmation. (Exhibit 67) On February 9, 2015, Staff Lieutenant K. Senato ("Senato") contacted to advise name appears on the current Referral List and to contact to schedule an interview. Then based on his interpretation of Kline's involuntary transfer memo, Senato denied the request to schedule. "This agreement will preclude you from working overtime or transferring to any position at Howard R. Young for a period of 2 years." (Id.)

85. On February 20, 2016, contacted *Wesley, Biddle,* and *Richman*. Inquired with Wesley if he knew a Senato had refused an opportunity to interview.  Asked Biddle since Richman's grievance decision stated transferred

for operational reasons; then why the denial of opportunity. Requested Richman to uphold his decision and to be allowed an interview. (Exhibit 68) Neither of the three acknowledged the violation or request.

PRE-TERMINATION LETTER

86. Defendant considered employment termination based on following violations: Code of Conduct 1.5; Unbecoming Staff Conduct (e) absence from duty without leave; 2.8 Staff Availability and Timely Performance of Duties and Merit Rule 15.1.1, Employee Responsibilities. (Exhibit 69)

87. On April 20, 2016, requested information and documentation supporting dismissal consideration to respond to allegations and charges appropriately. (Exhibit 70)

88. On April 22, 2016, Petroff informed there was no disciplinary package. (Exhibit 71)

89. Employee Disciplinary Action Policy 9.12 required Defendant to investigate and give the Plaintiff a meaningful opportunity to respond to the charges. (Exhibit 72) CBA required the Defendant to provide copies of all disciplinary actions involving dismissal. (Exhibit 73 ) Merit Rule 12.1 required Defendant to show Plaintiff committed the alleged offenses and offer specified due process. (Exhibit 74) Standard Operating Procedure ("SOP") Employee Disciplinary Action 40.03 required a disciplinary package with supporting documents. (Exhibit 75)

REASONS TO RECOMMEND TERMINATION

*On March 29, 2016, you were directed by Warden Evans to report for your shift beginning midnight March 30, 2016. You called off sick.*

90. On March 28, 2016, contacted Evans to explain how the involuntary transfer was retaliatory and had concerns over safety. Whereas expected somewhat of assurance of safety, it would be Okay to report to her institution; the response heightened worries and concerns. (Exhibit 76)

Plaintiff "…*While I remain optimistic about the job, I am extremely worried and concerned about my safety and well-being of reporting to PCCC. Please Advise.*"

Evans: "*You are to report to the Plummer Center on March 30, 2016 for your scheduled 12 x 8 shift.*"

91. Defendant confirmed called off on Tuesday, March 29, 2016, <u>for shift beginning midnight Wednesday, March 30, 2016</u>. However, failed to mention that approval authority, Shift Commander accepted the call off due to being sick and required medical documents to resume duty.

> On <u>March 30, 2016,</u> you requested an extension of unpaid leave. Warden Evans responded and directed you <u>to report for your next scheduled shift</u>.

92. Although unspecified [Saturday, April 2, 2016] <u>next shift</u> was; nonetheless succeeding the accepted call off for shift beginning midnight "Wednesday, March 30, 2016". Biddle referenced Evans Email [to report for your next scheduled shift] sent on March 30, 2016, at 2:58 PM. (Exhibit 77)

> *You did not report nor did you contact the shift commander to make them aware you would not be reporting for duty.*

93. It is correct that Plaintiff did not report for duty or communicate with the Shift Commander on Wednesday, March 30, 2016, for <u>shifts beginning midnight</u> Thursday, March 31, 2016, or Friday, April 1, 2016. As confirmed by Klein's involuntary transfer memo, the scheduled days off were Thursdays/Fridays. (Exhibit 78 ) Defendant untruthfully stated did not contact the Shift Commander for the <u>next scheduled shift</u>. On Friday, April 1, 2016, for shift beginning midnight Saturday, April 2, 2016, contacted the Shift Commander "three times." (Exhibit 79) Furthermore, followed his directive to call Staff Lieutenant W. Lee and then Dep. Warden W. Wilson. Neither of the two answered. Resuming duty was contingent on attaining and submitting medical documents. Had contacted the 12x8 Shift Commander to ensure duty roster did not have Plaintiff's name listed. Also, if the Shift was aware, Plaintiff had to submit medical documents before resuming duty.

## TERMINATION LETTER

94. First, Biddle's pre-termination letter did not clarify the date [beginning midnight Saturday, April 2, 2016] of the next scheduled shift. Similarly, Coupe's termination letter did not specify if he intended failure to report for duty to work the shift beginning midnight Wednesday, March 30, 2016, approved call off. Alternatively,

failure to report for duty on Wednesday, March 30, 2016,  to work the shift starting midnight Thursday, March 31, 2016, first of two scheduled days off.  Nonetheless, a wrongful termination. (Exhibit 80)

### CONTINUED UNAVAILABILITY FOR WORK

95. On March 29, 2016, Shift Commander that approved the call off, required medical documents to resume duty. The Doctors office could not have scheduled an appointment on Saturday, April 2, 2016, or Sunday, April 3, 2016. Therefore, technically afforded Plaintiff Monday, April 4, 2016, to see a Doctor to obtain the required medical documents. On Tuesday, April 5, 2016, issued the pre-decision termination letter, that ensured the "continued unavailability for work."


### PRE-TERMINATION MEETING

96. The termination letter did not state the reasons Plaintiff did not attend the meeting. On April 20, 2016, asked for documentation concerning dismissal decision. Also, requested to audiotape the meeting. On April 22, 2016, Defendant rescheduled the pre-termination meeting from Administration Building to Central Violation of Probation ("CVOP"). (Exhibit 81)

97. On April 26, 2016, contacted Biddle to ask the reason to change the venue of the pre-termination meeting to CVOP. To request if the dismissal hearing could be held at the Administration Building, as has been the case for previous employees. Also, implored her assistance to prevent additional suffering and embarrassment from facing co-workers at CVOP. Furthermore, Union had not confirmed to accompany for representation. (Exhibit 82)

98. On April 27, 2016, Biddle stated meeting would be held at CVOP. Informed her will not go to CVOP for the meeting. Also, to preserve sanity, categorically refuse to suffer further discrimination and harassment from Defendants. Requested her to forward the paperwork and sent her medical document. (Exhibit 83)

100. Defendant lied to EEOC that Plaintiff did not attend the Pre-Termination hearing scheduled at Administration Building. (Exhibit 84)

101. Plaintiff, to this day, does not know who COAD Vice-President Bernard Garnett is. Also, Representative Shula Reeves had not acknowledged the request for representation.

102. After receiving the termination letter, emailed to Coupe to apprise him of his decision to terminate a state employee for not calling off on a scheduled day off. Also, had Cc: Markell and Attorney General M. Denn. (Exhibit 85)

## INTERFERENCE WITH FMLA

101. On April 7, 2016, had the Doctor's appointment. Doctor Angela Brown ("Brown") diagnosed major depression and advised not to report to work.

102. On Friday, April 8, 2016, received the medical letter that stated Plaintiff was unable to return to work at this time. (Exhibit 86)

103. On Monday, April 11, 2016, asked Biddle to whom should Plaintiff forward medical document. Her response: *Warden Evans denied your request for additional leave and the attached memo was sent to you on April 5, 2016." She forwarded the pre-termination letter.* (Exhibit 87)

104. On April 14, 2016, Email sent to Biddle: "*Director, Today I have called twice and left voice messages for Ms. Wheeler with no response. Also, to reiterate, I have medical/FMLA documents which I can submit if advised who they need to be forwarded to.*" (Exhibit 88 ) Her Response: *Linda has been out of the office this afternoon. She is working on scheduling a meeting date. She will be back in touch with you by Monday, April 18th. Thank you.*

105. On May 10, 2016, after forwarding the termination letter, Defendant inflicted further emotional distress and mortification. For no reason, contacted Delaware State Emergency Services. Natalie, from Crisis Intervention Services, advised Defendant reported Plaintiff to be homicidal and suicidal. Assured Natalie it was a false reporting, but she warned failure to cooperate would warrant authorities to detain and take Plaintiff to Hospital and attending Personnel there would acquire same information. During the nearly 30-minute phone

interview, had to answer personal and medical questions. The justification to report to Crisis Intervention Services, Emails sent over two weeks prior. Delaware Emergency Services has Richman listed as an administrator.

NOTE: THIS IS THE ONLY ALLEGATION PLAINTIFF CANNOT SUPPORT BECAUSE IT OCCURRED POST-EMPLOYMENT TERMINATION.

106. The label of instability, false reporting to Delaware Emergency Services was not the final episode of dehumanization. Defendant initiated a Sharma Alert at the Administrative Building. Several ex-coworkers cautioned to avoid going to Administration Building to return equipment and uniform. Also, implementation of checkpoints and mandatory escort for even Employees. As one of the co-workers stated, they painted you as a terrorist; possibly to validate Surveillance and Phone Tap. As recent as December of 2017, a reliable source confirmed Coupe had posted Plaintiff's State ID picture around the administrative building, on one of which a turban and beard were drawn to portray as Al- Qaeda.

## IV. STATEMENT OF CLAIMS

### COUNT 1. FAILURE TO PREVENT HARASSMENT, DISCRIMINATION, OR RETALIATION

107. Plaintiff was an employee of Defendant at HRYCI.

108. Plaintiff was subjected to harassment discrimination, hostile work environment, and retaliation in course of employment.

109. Wesley, Lawler and Petroff failed to act, to take all reasonable steps to prevent the harassment, discrimination, hostile work environment, retaliation.

110. Plaintiff suffered severe emotional and psycholgoical distress.

111. Defendants failure to act, to take all reasonable steps for prevention was a substantial factor in causing Plaintiff harm.

## COUNT 2. NATIONAL ORIGIN DISCRIMINATION

112. Due to Plaintiff's National Orgin, denied several promotional opportunities as a qualified employee. Then retaliated because of complaints about such discrimination that violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, and 42 U.S.C. 1981 and 1983.

113. Plaintiff, a member of protected group.

114. Applied for Lieutenant vacancies and was qualified.

115. Wesley rejected Plaintiff despite of qualifications.

116. Non-Indian employees with lesser qualifications were promoted.

117. Wesley relisted vacancies to continue his search.

118. Wesley's highest score standard for promition applied only to disadvantage Plaintiff.

### COUNT 3. RETALIATON

119. Plaintiff complaints against Wesley were protected activity.

120. Wesley took adverse employement actions with removal from workplace, FFDE, and disciplinary action.

121. Wesley's retaliaton was motived by protected activity; to deter Plaintiff and others for reporting his unlawful conduct.

122. Wesley's profferred explanations for adverse actions were false and pretextual.

123. Applied charges contradicted the witnesss statements.

## COUNT 4. DEFAMATION OF CHARACTER

124. Berggum made false statements of fact about plaintiff

125. The statements were defamatory and published

126. Plaintiff reputation was harmed

## COUNT 5. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

127. Breach of Duty; Gross Negligence; Aiding and Abetting; Americans with Disabilities Act, as amended, 42 U.S.C. 12101 et seq.; 5 CFR Part 339 Medical Qualification Determination.

128. Coupe and Durkee intentionally and recklessly breached his legal duty by first allowing,

129. Aiding and abetting Wesley's malicious prosecution of Plaintiff.

130. Without Coupe's approval, Wesly could not have removed Plaintiff from the workplace on November 10, 2014, until November 25, 2014.

131. Without Durkee's approval, Wesley could not have subjected Plaintiff to a retaliatory FFDE.

132. Wesley's retaliatory actions were extreme and outrageous; caused plaintiff severe emotional distress.

## COUNT 5. INTERFERENCE WITH FMLA AND RETALIATION

133. Defendant violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601 *et seq.* with interference with rights under the FMLA and acted in retaliation with refusal to accept medical documents to process leave request.

134. Defendant is a covered Employer.

135. Plaintiff was eligible for FMLA leave.

136. Plaintiff exercised the right to take qualifying [FMLA/Medical] leave.

137. Plaintiff suffered adverse employment action with Biddle's interference with FMLA.

138. Biddle refused to acknowledge, accept, and process medical and FMLA paperwork.

139. Biddle's retaliatory interference was a substantial factor in Wrongful Termination.

## COUNT 6. BREACH OF CONTRACT

140. Plaintiff was discharged by the Defendant without a just cause in violation CBA governing the terms and conditions of employment. Union breached its duty to fairly represent the

Plaintiff, as one of its members, in failing to investigate or otherwise process the grievance against the Defendant and proceed to Arbitration; procedures set forth in the CBA.  29 U.S.C. 185

141. Plaintiff's employment was governed by an active and valid Collective Bargaining Agreement.

142. Plaintiff was excused from having to report for duty for shift starting midnight Wednesday, March 30, 2016.

143. Defendant's pre-termination letter cited violation of code of conduct and policies.

144. CBA Article [9.0 Employee Rights] 9.2 required defendant to provide copies of all the disciplinary actions involving suspension, demotion and diismissal to employee and the institutional Vice-President.

145. Defendant did not prepare a disciplinary package; to establish just cause for employment termination.

146. As required Defendant did not provide information and documentation that supported allegations and charges.

147. CBA Article 10 Investigation Interview Rights required Defendant to interview Plaintiff.

148. Defendant did not interview Plaintiff or [CBA 10.1.5] provide a copy of investigative report upon completion while disciplinary action was pending.

149.  Defendant did not establish just cause for employment termination.

## V. RELIEF SOUGHT

150. Reinstatement to the Job and grant the illegally denied Lieutenant promotions.

151. Compensatory damages to be awarded by the court or jury.

152. Punitive damages as punishment for the defendants' unlawful conduct.

153. Declaratory and injunctive relief from the court designed to make him whole as a result of the defendants' unlawful conduct.

Dated: 08/07/18

Amit Sharma
Plaintiff
22 Lisa Drive
Newark, DE 19702
302-509-7740

# EXHIBIT B

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

AMIT SHARMA                                    )
                                               )
                    Plaintiff,                 )
            v.                                 )        C.A. No. N18C-01-091-ALR
                                               )
STEVEN WESLEY, et al.                          )
                                               )
                    Defendants.                )

## NOTICE OF FILING OF NOTICE OF REMOVAL

TO:   CLERK OF THE SUPERIOR COURT OF DELAWARE

Please take notice that on this 15th day of August, 2018, Defendants, filed a Notice of Removal of the above-captioned matter to the United States District Court for the District of Delaware.  A copy of the Notice of Removal is attached as Exhibit "A."

In accordance with 28 U.S.C. § 1446(d), this Notice, together with the Notice of Removal filed in the United States District Court for the District of Delaware, has effected a removal of this case from the Superior Court of the State of Delaware, to the United States District Court for the District of Delaware.  This Court "shall proceed no further unless and until this case is remanded."  28 U.S.C. § 1446(d).

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ *Adria B. Martinelli*
Adria B. Martinelli (#4056)
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendants

DATED:  August 15, 2018

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on August 16, 2018, she caused a true and correct copy of

the attached *Notice of Removal* to be filed and with the Clerk of the Court using CM/ECF.  A hard

copy of the *Notice of Removal* was sent to the following via First Class Mail on the same date:

Amit Sharma
22 Lisa Drive
Newark, DE 19702

*/s/ Adria B. Martinelli*
Adria B. Martinelli (No. 4056)